**CITY–WIDE COALITION AGAINST CHILDHOOD LEAD PAINT POISONING et al.**

v.

**PHILADELPHIA HOUSING AUTHORITY, et al.**

Civ. A. No. 72–1515.

United States District Court,
E. D. Pennsylvania.

March 12, 1973.

George D. Gould, Jonathan M. Stein, Community Legal Services, Inc., Philadelphia, Pa., for plaintiffs.

Harold Cramer, Gilbert Scutti, Asst. U. S. Atty., Philadelphia, Pa., for defendants.

## MEMORANDUM OPINION

VAN ARTSDALEN, District Judge.

On January 23, 1973, a preliminary injunction issued enjoining the defendant, Department of Housing and Urban Development, its agents, employees and officers

from selling, conveying or transferring title or ownership, or from contracting to do any of the same, as to any residential housing structure located within the geographical limits of the City of Philadelphia, Pennsylvania, to any person or entity for the purpose of utilizing such structure for human habitation until and unless it completely removes from such premises on all surfaces, including exterior surfaces, lead based paint in such manner and in accordance with all the rules and regulations of the Department of Housing and Urban Development of the United States Government, and with all the rules and regulations of the Department of Public Health of the City of Philadelphia.

And in order to be assured that these regulations are carried out, the Department of Housing and Urban Development is

further enjoined from transferring title to such properties for such purposes until and unless it first requests from the City of Philadelphia, Department of Public Health, an inspection of the premises to see that it does comply with all of the rules and regulations of the City of Philadelphia, Department of Public Health, said request for such inspection to be made at least one week prior to the date of the transfer of title.

The federal defendants have now moved for an order staying the preliminary injunction pending a possible appeal. They candidly admit that an appeal has not been definitely decided upon and that such a decision cannot be expected "until all agencies and departments concerned have had an opportunity to review [the order] and analyze its

national implications." The motion is accompanied by the affidavit of William D. Patterson, Area Director, Philadelphia Area Office of the Department of Housing and Urban Development[1] (hereinafter HUD) attesting to the "considerable burden" placed on HUD by the order.

The affidavit, in effect, contends that the stay should be granted because of the extreme financial burden placed on HUD if it must comply with the City of Philadelphia, Department of Public Health regulations concerning removal of lead-based paints on housing owned or held by HUD. The second contention is that the order precludes HUD from completing settlement on houses that were under agreements of sale at the time of the entry of the preliminary injunction. I was aware of the financial burden when the order was made, and reject this contention as a valid reason to stay the order. Concerning any existing agreements of sale, HUD and/or the purchasers may, by motion, on an individual *ad hoc* basis seek relief from the injunction provided no children will be residing in the house and the purchasers are fully advised of the condition of the house, the potential danger, and the regulations of the City of Philadelphia, Department of Public Health concerning removal of lead-based paint.[2]

The preliminary injunction order entered on January 23, 1973, was issued directly from the bench in view of my finding that the situation was of such an immediate and inherently hazardous nature that no further delay could be tolerated. At that time I indicated that the tentative findings of fact would be subject to revision from time to time. This motion affords the court an opportunity to more fully express and discuss the findings of fact and conclusions of law contained in the January 23rd Order.

1. Mr. Patterson has recently resigned.

2. This is not to be construed as indicating that relief will necessarily be granted un-

## FINDINGS OF FACT

1. Title 42 U.S.C. § 4821 mandated that HUD submit to the Congress, by January 13, 1972, a report from the Secretary of his findings and recommendations relative to

the nature and extent of the problem of lead-based paint poisoning in the United States, particularly in urban areas, and the methods by which lead-based paint can most effectively be removed from interior surfaces, porches, and exterior surfaces to which children may be commonly exposed, of residential housing.

2. The Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. § 4801 *et seq.*, acknowledged the ever growing fund of knowledge on the subject of childhood lead paint poisoning and the recognition that lead paint poisoning was a serious and sometimes irreversible disease causing brain damage, and even death, to young children, particularly in urban, and most especially in inner city, areas.

3. HUD has not yet complied with the Congressional mandate and its report is now more than one year overdue.

4. Despite the fact that no report has been transmitted to Congress, HUD has issued rules and regulations concerning lead-based paint use and removal in all federal and federally-assisted construction and rehabilitation projects. 37 Fed.Reg. 22732 (October 21, 1972).

5. HUD is complying with these regulations with regard to presently owned HUD properties and has indicated its intention to comply as to after acquired properties.

6. HUD regulations prohibit the *use* of lead-based paint on surfaces readily accessible to children under 7 years of age in any residential structure undergoing federally-assisted construction or rehabilitation. § 35.5(b).

der such conditions, but only that careful consideration will be given to such a motion based on all circumstances of each case.

7. HUD regulations further define as a health hazard all "crackling [sic], scaling, peeling, and loose lead-based paint on applicable surfaces" (those surfaces readily accessible to children under 7 years of age). § 35.3(e).

8. Such defective paint conditions are presumed to contain lead-based paint unless otherwise shown by testing to be safe. (§ 35.16). All hazardous surfaces (i. e., cracking, scaling, peeling and loose lead-based paint accessible to children under 7 years of age)

> shall receive adequate treatment to prevent the ingestion of the contaminated paint. Particular care shall be taken to correct conditions of cracking, scaling, peeling, and loose paint. . . . All such surfaces which require treatment shall be thoroughly washed, sanded, scraped, or wire brushed, so as to remove all cracking, scaling, peeling, and loose paint before repainting.

(§ 35.18). Such "treated" surfaces must be painted over with at least two coats of non-lead paint and in all cases where such treatment is impractical the paint must be removed or covered over. (*Id.*).

9. The practical effect of the regulations is that HUD removes only cracking, scaling, peeling or loose paint and renders the surface "tight" but *does not remove* the lead-based paint which has not "broken down."

10. The Department of Public Health of the City of Philadelphia requires the complete removal of all lead paint from surfaces which may be accessible to children. By administrative interpretation, "accessible to children" includes all surfaces up to a height of five feet from any floor, in homes where children reside.

11. HUD owns approximately 1650 houses in the City of Philadelphia acquired principally through foreclosures on FHA insured mortgages.[3]

12. HUD adds approximately 200 houses per month to its inventory.

13. Such houses are "rehabilitated" and then resold to private individuals for use as residences.

14. All such rehabilitation is done in accordance with HUD regulations, at least in theory, but nothing additional is done. Treatment of lead-based paint is done in accordance with HUD regulations, and without regard to the regulations of the Department of Public Health of the City of Philadelphia.

15. Children can become poisoned by eating lead-based paint and from chewing or "teething" on wood and other surfaces even where the lead-based paint has been painted over and rendered tight in accordance with HUD regulations.

16. Expert testimony indicates that in about 22 percent of reported or suspected lead-based paint poisoning cases among children in Philadelphia the high blood-lead levels resulted or came about in homes where the painted surfaces were "tight" as required by HUD regulations.

17. In at least three instances in the City of Philadelphia private individuals had purchased homes from HUD and thereafter inspection by the City Department of Public Health, subsequent to a resident child having been diagnosed as suffering from lead poisoning, disclosed each such residence to be in violation of the City health regulations pertaining to lead paint. The homeowners were directed to correct the situation or be subject to penalties and condemnation proceedings for maintaining a dwelling unfit for human habitation.

18. In one other case Mrs. Page and her husband purchased a home from HUD and settlement was held in May, 1969. The house was freshly painted and all painted surfaces were tight when purchased thereby complying with HUD

---

3. The testimony presented at the hearing led me to conclude that the HUD inventory numbered approximately 1200. The higher figure given above is based on the Patterson affidavit filed in connection with the motion to stay.

regulations. In October, 1970, Mrs. Page's small child became violently ill and was hospitalized. His condition was diagnosed as lead poisoning. Mrs. Page ascertained that the child had chewed on wooden window ledges in her home. Had the lead-based paint been completely removed before repainting in accordance with City of Philadelphia Department of Public Health regulations, the child could not have ingested lead from chewing on the window ledges.

19. The Department of Public Health of the City of Philadelphia inspected the Page home and found that the house contained dangerous quantities of lead-based paint in multiple violations of city regulations. All of the same conditions of the residence existed at the time the home was acquired from HUD. The Page family has been ordered to correct the situation but has thus far been unable to do so because of the cost involved.

20. The cost of removing all interior lead-based paint on houses of the type acquired by HUD has been estimated to be between a low figure of $400 and a high figure of $2,000 per home.[4]

21. Most homes acquired by HUD are repainted by HUD at a cost of approximately one thousand dollars ($1,000) per house and the average total cost of rehabilitation of such a house is approximately four thousand dollars ($4,000); the average resale price is about eight thousand dollars ($8,000).

22. Where rehabilitation costs are excessive or would exceed the resale value, the buildings are destroyed.

23. No specific provision of the regulations of the City of Philadelphia, Department of Public Health, prohibits the sale of a residence containing lead-based paint. In the event, however, that a house in which a resident child has suffered lead poisoning is inspected by the Department of Public Health and found to contain lead-based paint in violation of the City regulations (as to percentage of lead content or "accessibility" to children), the house is condemned as being unfit for human habitation, unless promptly corrected by complete removal of such paint in accordance with City regulations.

24. HUD makes a regular practice of "rehabilitating" and selling such houses as it acquires to families for residential purposes, many of whom have young children.

25. HUD sells its acquired houses to the public, which houses fail to meet the standards of the regulations of the City of Philadelphia Department of Public Health in regard to lead-based paint. No notice or warning is given to the purchasers that such houses do not conform to the City Public Health standards.

26. The danger to the public health and general welfare from such HUD properties being placed in private hands for habitation by small children is immediate and continuing.

27. This grave hazard can be readily eliminated at varying estimated costs (Finding 19, *supra*), and by HUD not re-selling or renting such houses until and unless the houses comply with both HUD and City Department of Public Health regulations.

28. The regulations of the City of Philadelphia, Department of Health, concerning treatment and correction of houses containing lead-based paint are reasonable and within proper limitations and valid.

### CONCLUSIONS OF LAW

1. This court has jurisdiction under 28 U.S.C. § 1361 and 5 U.S.C. §§ 702–704.

2. There is a reasonable likelihood of eventual success by plaintiffs on the merits.

3. Immediate, irreparable, and extensive harm will occur to the plaintiffs

---

4. The affidavit of William B. Patterson, attached to the present motion, gives an estimated cost range of $600–$1200 per property for interior surface removal.

and others if preliminary injunctive relief is not granted.

4. The plaintiffs have standing to bring the present action.

5. A preliminary injunction, pending final determination of the merits should be granted to best maintain the "status quo."

## DISCUSSION

■ Under decisions of the Supreme Court in Association of Data Processing Service Organizations, Inc. v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L. Ed.2d 184 (1970) and Barlow v. Collins, 397 U.S. 159, 90 S.Ct. 832, 25 L.Ed.2d 192 (1970), plaintiffs may challenge an administrative regulation if the plaintiffs (1) "have the personal stake and interest that impart the concrete adverseness required by Article III" of the Constitution, and (2) are within the zone of interests protected by the act, and (3) judicial review is not precluded. Barlow, supra, at 164f, 90 S.Ct. at 836. The Administrative Procedure Act, 5 U. S.C. § 701 et seq., allows judicial review of agency action "except where '(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law.'" Id. at 165, 90 S.Ct. at 837. In Barlow a general grant of power to an agency to "prescribe such regulations, as he [Secretary of Agriculture] may deem proper to carry out the provisions" of the law did not preclude judicial review. Only upon a showing of "'clear and convincing evidence' of a contrary legislative intent" will judicial review be prohibited. I find no prohibition by inference or statutory fiat in the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. § 4801 et seq., or elsewhere that would preclude district court review of the actions of HUD in its treatment of lead-based paints on houses it owns.

The Third Circuit Court of Appeals has adopted the "injury in fact" test to determine standing under the constitutional limitations of Article III for federal court jurisdiction. Shannon v. United States Department of Housing and Urban Development, 436 F.2d 809 (3rd Cir. 1970). There, standing to litigate was granted residents, businessmen, and civic group representatives, who claimed that a planned HUD rental supplement apartment project would affect their investment in homes and businesses, and "the very quality of their daily lives."

In Shannon, plaintiffs were neither displaced persons nor potential occupants of the project. In the present case, the complaint alleges that the individual members of the various plaintiff civic organizations are "parents and children living in properties owned, leased or maintained by defendants who have been subjected to and are now subject to the life and health-endangering disease of lead paint poisoning caused by the hazardous conditions of lead paint on defendants' properties," (Paragraph 3 of the Complaint); that members and children of members of another plaintiff civic organization "are directly injured and subjected to serious bodily and mental harm, and even death, by the actions and inactions of defendants." (Paragraph 4 of the Complaint). Another civic group plaintiff is comprised of homeowners who have purchased properties under FHA programs. (Paragraph 6 of the Complaint). The individual plaintiffs claim a direct personal injury to the minor individual plaintiff from exposure to lead paint in "a property owned and maintained by defendants." (Paragraph 7 of the Complaint).

■ Although it is not clear that all of the above allegations refer to all of the defendants, nevertheless the plaintiffs are clearly persons aggrieved by the actions and/or inactions of HUD and other defendants under the Lead-Based Paint Poisoning Prevention Act, 42 U.S. C. § 4801 et seq. The plaintiffs allege that they and/or their members and their members' small children are residents of urban areas and of residences owned, maintained and sold by defendants, that

they and/or their members have children that are or may be exposed to lead-based paint poisoning, and that they and/or their members have in the past and will in the future suffer personal physical and mental injury as well as monetary hardships caused by defendants owning, leasing, maintaining and selling houses containing dangerous levels of lead-based paint that is accessible to small children. Plaintiffs clearly have standing to maintain this action. *Cf.* Davis v. Romney, 355 F.Supp. 29 (E.D.Pa.1973, Davis, J.). *Cf.* Sierra Club v. Morton, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), where there was no showing that the members of the plaintiff Sierra Club used the premises that was the subject to the litigation "for any purpose, much less that they use it in any way that would be significantly affected by the proposed actions of the respondents." *Id.* at 735, 92 S.Ct. at 1366.

■ Basically HUD contends that its far less stringent rules and regulations concerning treatment of lead-based painted surfaces in HUD acquired properties supersedes and overrides reasonable local health regulations concerning residences containing dangerous levels of lead contained in lead-based painted surfaces in areas accessible to small children. Whether Congress may grant HUD such preemptive right is not the question. To date Congress has not attempted to do so, and HUD's contention that it is immune from reasonable local health requirements is incorrect.

Reference to the Lead-Based Paint Poisoning Prevention Act, 42 U.S.C. § 4801 et seq., is appropriate. Subchapter I provides that the Secretary of Health, Education and Welfare (HEW), may make grants to local units of government "for the purpose of assisting . . . in developing and carrying out local programs *to detect and treat* incidents of lead-based paint poisoning." (Emphasis added). Such local programs should include (1) educational programs concerning the "health danger and prevalence of lead-based paint poisoning

among children of inner city areas," (2) development of "intensive community testing programs" to detect incidents of such poisoning and to insure prompt medical treatment of victims of such poisoning, (3) follow-up programs to protect identified victims "against further exposure . . . in their living environment," (4) other actions to reduce or eliminate such poisoning. (42 U.S.C. § 4801(c)).

Subchapter II provides that local grants may be made by HEW to carry out local programs "*to eliminate* the hazards of lead-based paint poisoning." (Emphasis added.) Such a local hazard elimination program should include, *inter alia*, "a comprehensive program requiring the prompt elimination of lead-based paints from all interior surfaces, porches, and exterior surfaces to which children may be commonly exposed, of residential housing on which lead-based paints have been used as a surface covering, including those surfaces on which non-lead-based paints have been used to cover surfaces to which lead-based paints were previously applied." (42 U.S.C. § 4811(a)(2)). Plaintiffs' primary objective in the present action is to bring about as promptly as possible a complete city-wide implementation of an effective local program harmonious with the letter and spirit of Subchapters I and II. The request for preliminary injunctive relief, however, is premised on the failure of HUD, maintaining and re-selling its acquired residences, to comply with reasonable local regulations and HUD's failure to comply with the spirit and intent of the Act of Congress to eliminate the hazards of lead-based paint poisoning to small children.

Subchapter IV provides that the Secretary of HEW shall "take such steps and impose such conditions as may be necessary or appropriate to prohibit the use of lead-based paint in residential structures constructed or rehabilitated . . . by the Federal government, or with Federal assistance." (42 U.S.C. § 4831). Present HUD regulations do prohibit future use of any lead-based

paint for repainting HUD and HUD assisted housing, and no complaint is made as to lack of governmental compliance with Subchapter IV.

. The Act directs HUD under Subchapter III (42 U.S.C. § 4821) in consultation with HEW to develop and carry out a demonstration and research program to determine the nature and extent of the problem of lead-based paint poisoning and the methods for most effective removal of lead-based paint from interior and exterior surfaces of residences in which children may be commonly exposed, and to make a report to Congress by January 13, 1972. This is the only duty expressly imposed on HUD by the Act. The primary responsibilities under Subchapters I, II and IV are placed in the hands of HEW.

■ The statute under which HUD was created, 42 U.S.C. § 3531 et seq., transferred to the Secretary of HUD all the functions, powers and duties of the Federal Housing Administration (FHA) and the Public Housing Administration. 42 U.S.C. § 3534. The Secretary of HUD was authorized to foreclose on FHA mortgages, and upon acquisition, to "complete, administer, remodel and convert, dispose of, lease, and otherwise deal with, such property." (42 U.S.C. § 3535(i)). Undoubtedly under these powers, HUD may promulgate rules and regulations concerning the maintenance and rehabilitation of HUD acquired and owned properties. 42 U.S.C. § 3535(d) expressly grants rule making powers "necessary to carry out his [the Secretary of HUD] functions, powers, and duties."

■ HUD does not gain on behalf of the government any sovereign immunity nor supremacy by reason of .its rule making powers in the context of this litigation.

■ Although there is case law that indicates the government is not subject to local building and/or licensing requirements adopted purely for local purposes, as noted by Senior Judge Biggs in

United States v. City of Chester, 144 F. 2d 415, 421 (3rd Cir. 1944):

immunity from local building restrictions or ordinances does not imply that the Administrator is free to construct unsafe dwellings or housing which may be deleterious to the health and welfare of a community.

The regulations of HUD expressly recognize that they do not preempt local ordinances concerning elimination of lead-based paints. § 35.24 of the regulations provides

The provisions of this subpart [elimination of lead-based paint] constitute the policy of this Department. They shall not be construed as relieving the owner of his responsibility for compliance with local ordinances, codes, and regulations pertaining to lead-based paint, nor does the Department assume any responsibility with respect to enforcing, interpreting, or determining compliance with such local requirements.

(§ 35.24) (37 Fed.Reg. 22733 (1972)). The subpart referred to expressly includes, inter alia, "HUD-owned properties that are to be sold as is or are to be rehabilitated before sale . . ." (§ 35.14(a)) (37 Fed.Reg. 22733 (1972)). The preliminary injunction prohibited HUD from selling, conveying or transferring title or ownership to any HUD owned residential housing structure in Philadelphia to be used for human habitation until and unless HUD first complies with its own rules and regulations and the rules and regulations of the Department of Public Health of the City of Philadelphia concerning correction of .lead-based painted surfaces. All that this order seeks to do is to require HUD as the owner of property to comply with the City regulations to the same extent as is required of all. other homeowners.

Cut to its bare bones, HUD contends that it should be permitted to continue to sell urban residential houses that it acquires despite the fact that the houses contain dangerous levels of lead-based

paint accessible to small children, and despite the fact that the houses do not conform with City of Philadelphia, Department of Public Health regulations and are subject to condemnation by the Department of Public Health as unfit for human habitation, thereby subjecting the owners to fines and criminal penalties, without warning the purchasers of the situation—all because elimination of the hazard might cost an estimated high expenditure of $1200 per house which might not be recouped on re-sale. HUD further seeks moral justification on the basis of a housing shortage for low-income families. To equate the admittedly real and grave danger of permanent brain damage to small children with the relatively modest additional cost of rehabilitating houses to free them from lead-based paint raises issues that no amount of rationalization or legal theory can justify on moral grounds.

It should be carefully borne in mind that HUD has not challenged the reasonableness of the City health regulations. That these regulations are more stringent than those of HUD is undisputed, but that their purpose is to carry out the Congressional intent of lead-based paint poisoning elimination is equally clear.

The stay order will be denied.

## ON MOTION TO DISMISS

Defendant, United States Department of Housing and Urban Development (HUD) has filed a motion to dismiss the complaint or in the alternative for summary judgment. HUD's motion is grounded on the contentions that this court lacks subject matter jurisdiction and that plaintiffs have failed to state a claim upon which relief can be granted.

These contentions are incorrect, and have been fully treated in the accompanying order, issued today, concerning HUD's motion to stay the preliminary injunction.

It should be noted, however, that HUD's brief in support of the present motion points out clearly that the City of Philadelphia, Department of Public Health regulations are acceptable to the defendant, and that defendant is fully complying with them. The brief in Support of Motion to Dismiss Complaint or in the Alternative for Summary Judgment, at page 5 states:

Nevertheless, although HUD is not legally bound by the Philadelphia Code, HUD's own regulations and administrative policies . . . in effect create full compliance by HUD with the substance of all relevant provisions of the Philadelphia Code directed toward the detection and elimination of existing lead paint hazards and toward the prevention of future creation of lead paint health hazard conditions.

If this is the case, HUD should sustain no hardship whatever, since all that the order of this court granting the preliminary injunction requires, in addition to compliance, is pre-sale inspection by the Department of Public Health of the City of Philadelphia.

The question of appropriate class composition is deferred until a proper motion for class determination is filed.

The motion will be denied.